**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| RYAN WALTERS, Individually And On Behalf Of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MEAD JOHNSON NUTRITION COMPANY, JAMES M. CORNELIUS, STEVEN M. ALTSCHULER, M.D., HOWARD B. BERNICK, KIMBERLY A. CASIANO, ANNA C. CATALANO, CELESTE A. CLARK, Ph.D., STEPHEN W. GOLSBY, MICHAEL GROBSTEIN, PETER KASPER JAKOBSEN, PETER G. RATCLIFFE, MICHAEL A. SHERMAN, ELLIOTT SIGAL, M.D., Ph.D., and ROBERT S. SINGER,<br><br>Defendants. | **Case No.**<br><br>**Judge**<br><br>**CLASS ACTION**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934, AND RULE 14A-9**<br><br>**JURY DEMAND** |

Plaintiff Ryan Walters ("Plaintiff"), by and through his undersigned counsel, brings this shareholder class action on behalf of himself and all other similarly situated public shareholders of Mead Johnson Nutrition Company ("Mead Johnson" or the "Company") against Mead Johnson and the members of the Company's board of directors (collectively, the "Board" or the "Individual Defendants"), for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78n(a) and 78t(a) respectively, and Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Merger") between Mead Johnson and Reckitt Benckiser Group plc ("Reckitt"). Plaintiff alleges the following based upon

personal knowledge as to himself, and upon information and belief, including the investigation of Counsel, as to all other matters.

**NATURE OF THE ACTION**

1. On February 10, 2017, Mead Johnson announced that it had reached a definitive Agreement and Plan of Merger ("Merger Agreement") under which Reckitt Benckiser will acquire all of the outstanding common stock of Clayton for $17.9 billion in cash. According to the Company, the value of the transaction, based on Mead Johnson's undisturbed closing stock price as of February 1, 2017, is $90 per Mead Johnson share, including the assumption of approximately $1.2 billion in net debt (the "Merger Consideration").

2. Defendants have violated the above-referenced Sections of the Exchange Act by filing a materially incomplete and misleading Schedule 14A Preliminary Proxy Statement (the "Proxy Statement") filed with the SEC on March 13, 2017. The Board recommends that Mead Johnson shareholders vote in favor of approving the Proposed Merger at the forthcoming shareholder special meeting, and agree to exchange their shares pursuant to the terms of the Merger Agreement based on, among other things, the factors examined by the Board to make its recommendation and the opinions rendered by the Company's financial advisors, Goldman, Sachs & Co. ("Goldman") and Morgan Stanley & Co. LLC ("Morgan Stanley").

3. The Merger Consideration and the process by which Defendants agreed to consummate the Proposed Merger are fundamentally unfair to Mead Johnson's public shareholders in view of the Company's recent financial success and prospects for future growth.

4. To ensure the success of the Proposed Merger, the Board issued the Proxy Statement, which fails to provide shareholders with all material information necessary for them to assess the fairness of the Merger Consideration. In particular, the Proxy Statement fails to

disclose: (1) certain material projections for Mead Johnson, including a reconciliation of the non-GAAP (generally accepted accounting principles) projections to the most directly comparable GAAP measures and the line items used to calculate the non-GAAP measures, and (2) a fair summary of the financial analyses performed by Goldman and Morgan Stanley.

5. For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from proceeding with the shareholder vote on the Proposed Merger, or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations Sections 14(a) and 20(a) of the Exchange Act.

6. Thus, it is imperative that the relief requested herein be granted prior to special meeting to ensure that Mead Johnson stockholders can make an informed decision on how to vote their stock regarding the Proposed Merger.

**PARTIES**

7. Plaintiff is, and has been at all relevant times, a shareholder of Mead Johnson common stock.

8. Defendant Mead Johnson is a Delaware corporation, with its principal executive offices located at 225 North Canal Street, 25th Floor, Chicago, Illinois 60606. Mead Johnson is a pediatric nutrition company. The Company manufactures, distributes and sells infant formulas, children's nutrition and other nutritional products.

9. Individual Defendant James M. Cornelius is Chairman of the Board and a director of the Company, and has served in such capacities since 2009.

10. Individual Defendant Steven M. Altschuler, M.D., has served as a director of the Company since 2009.

11. Individual Defendant Howard B. Bernick has served as a director of the Company since 2009.

12. Individual Defendant Kimberly A. Casiano has served as a director of the Company since 2010.

13. Individual Defendant Anna C. Catalano has served as a director of the Company since 2010.

14. Individual Defendant Celeste A. Clark, Ph.D., has served as a director of the Company since 2011.

15. Individual Defendant Stephen W. Golsby has served as a director of the Company since 2009.

16. Individual Defendant Michael Grobstein has served as a director of the Company since 2014.

17. Individual Defendant Peter Kasper Jakobsen has served as a President and director of the Company since 2012. He has also served as Chief Executive Officer of the Company since 2013.

18. Individual Defendant Peter G. Ratcliffe has served as a director of the Company since 2009.

19. Individual Defendant Michael A. Sherman has served as a director of the Company since 2015.

20. Individual Defendant Elliott Sigal, M.D., Ph.D., has served as a director of the Company since 2009.

21. Individual Defendant Robert S. Singer has served as a director of the Company since 2009.

22. The Board and Mead Johnson may collectively be referred to as "Defendants." Each of the Individual Defendants herein is sued individually, and as an aider and abettor, as well as in his or her capacity as an officer and/or director of the Company, and the liability of each arises from the fact that he or she has engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

**JURISDICTION AND VENUE**

23. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

24. Personal jurisdiction exists over each Defendant either because the Defendant is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

25. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue had an effect in this District; and (ii) Mead Johnson is incorporated in this District.

26. Plaintiff brings this Action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and the other public shareholders of Mead Johnson (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

27. This action is properly maintainable as a class action.

28. The Class is so numerous that joinder of all members is impracticable. As of March 9, 2017, there were approximately 183,617,672 issued and outstanding shares of Mead

Johnson common shares. All members of the Class may be identified from records maintained by Mead Johnson or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

29.     Questions of law and fact are common to the Class, including, among others: (i) whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy Statement in violation of Section 14(a) of the Exchange Act and SEC Rules and Regulations including Rule 14a-9; (ii) whether the Director Defendants have violated Section 20(a) of the Exchange Act; and (iii) whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their units regarding the Proposed Transaction based on the false and/or misleading Proxy Statement.

30.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class, Plaintiff have the same interests as the other members of the Class, and Plaintiff do not have any interests that are adverse to the Class. Accordingly, Plaintiff is adequate representatives of the Class and will fairly and adequately protect the interests of the Class.

31.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

32. Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

33. Mead Johnson is a pediatric nutrition company that manufactures, distributes and sells infant formulas, children's nutrition and other nutritional products.[1]

34. The Company's product portfolio includes: (i) routine and specialty infant formulas, (ii) children's milks and milk modifiers, (iii) dietary supplements for pregnant and breastfeeding mothers, (iv) pediatric vitamins, and (v) products for pediatric metabolic disorders.[2]

35. The Merger Consideration does not adequately compensate shareholders for their loss of control. In time preceding the Proposed Merger, the Company beat earnings per share estimates for two out of the three fiscal quarters.[3]

36. The future of growth prospects look bright, as on July 28, 2016, in a press release announcing their results for the second quarter of 2016, Individual Defendant Jakobsen stated:

> As we move through this year, I am pleased that we continue to deliver against our profit objectives despite a challenging global operating environment. We are making good progress with our portfolio and channel transformation in China despite near-term challenges. We are aligning the organization behind more ambitious operating cost reductions in support of both our growth and value creation strategies.

37. On January 26, 2017, the Company reported its financial results for the fourth quarter and year-end 2016. The Company saw an increase in EBIT by 15% in the fourth quarter

---

[1] http://www.reuters.com/finance/stocks/companyProfile?symbol=MJN.N.

[2] *Id*.

[3] https://seekingalpha.com/symbol/MJN/earnings.

2016, as compared to the same quarter the previous year. Noting the results, Individual Defendant Jakobsen stated:

> In the fourth quarter we continued to make progress with a series of important strategic transitions in key markets. Our imported products again grew strongly in China - and we doubled our sales volume via e-commerce out of Hong Kong over the prior quarter. Though it will take some time for us to complete the transition phase we are currently in, we are encouraged by early signs our plans are working.

38. Accordingly, it appears that the Merger Consideration offered to Mead Johnson's public shareholders in the Proposed Merger is unfair and inadequate because, among other things, the intrinsic value of the Company's common stock is materially in excess of the amount offered for those securities in the Proposed Merger given the Company's recent financial performance and prospects for future growth and earnings. If consummated, the Proposed Merger will deny Class members their right to fully share equitably in the true value of the Company.

39. It is therefore imperative that Mead Johnson's shareholders receive the material information (discussed in detail below) that Defendants have omitted from the Proxy Statement, so that they can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Merger.

**The Proposed Transaction**

40. On February 10, 2017, Mead Johnson issued a press release announcing the Proposed Merger, which states in pertinent part:

> GLENVIEW, IL. – February 10, 2017 – Mead Johnson Nutrition Company (NYSE: MJN) today announced that it has reached an agreement to be acquired by Reckitt Benckiser Group plc (RB), the world's leading consumer health and hygiene company. As a result of this transaction, Mead Johnson will become a new division of RB with its globally-recognized Enfamil and Nutramigen brands joining RB's portfolio of leading consumer health brands.

> RB has agreed to pay $90 cash for each share of Mead Johnson common stock in a transaction valued at approximately $17.9 billion (including net debt). The price represents a premium of 29% to MJN's undisturbed closing price on February 1, 2017 before market speculation of a potential transaction. Including Mead Johnson's net debt of $1.2 billion as of December 31, 2016, the total enterprise value of the transaction is $17.9 billion, representing a multiple of 17.4x 2016 non-GAAP EBITDA. The transaction has been unanimously approved by the Mead Johnson Board of Directors. Closing of the transaction is subject to customary conditions, including approval by shareholders of both Mead Johnson and RB and regulatory approvals, and is expected to occur during the third quarter of 2017. Mead Johnson will continue to pay its normal quarterly dividend until closing.
>
> "This transaction recognizes the value of our leading brands and strong, global organization," said Kasper Jakobsen, MJN's Chief Executive Officer. "As part of Reckitt Benckiser, a bigger health care focused business recognized for its marketing capabilities, we will derive benefits from both increased scale and diversification. We are pleased that our shareholders have an opportunity to recognize significant and immediate value and are excited for the new opportunities for our employees as part of a larger company."
>
> "Mead Johnson's geographic footprint significantly strengthens our position in developing markets, which account for approximately 40% of the combined group's sales, with China becoming our second largest 'Powermarket,'" noted RB's Chief Executive Officer, Rakesh Kapoor. "We are confident that our deep understanding of consumer needs and our expertise in scaling global brands will deliver significant growth for the MJN portfolio. We will draw on the best of both businesses and continue to build on Mead Johnson's extensive R&D, regulatory, quality and specialist distribution capabilities."
>
> Goldman Sachs acted as Mead Johnson's lead financial advisor. Morgan Stanley also acted as financial advisor to the company. Kirkland & Ellis LLP acted as Mead Johnson's legal advisor.

**The Incomplete and Materially Misleading Proxy Statement**

41. On March 13, 2017, Defendants filed the materially incomplete and misleading Proxy Statement with the SEC. The information contained in the Proxy Statement has been disseminated to Mead Johnson shareholders to solicit their vote in favor of the Proposed Merger. The Individual Defendants were obligated to carefully review the Proxy Statement before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not

contain any material misrepresentations or omissions. However, the Proxy Statement misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Merger, in violation of Sections 14(a) and 20(a) of the Exchange Act.

42. Specifically, the Proxy Statement discloses the Company's projections for the years 2017-2021. However, the Proxy Statement fails to reconcile non-GAAP unlevered free cash flows to GAAP EBIT. As the Company approved of Goldman and Morgan Stanley's use of *different* unlevered free cash flow projections, stockholders must be informed as to their specific differences (e.g. stock-based compensation). The failure to reconcile and explain these differences renders footnote six (6) on page 46 of the Proxy Statement false and misleading.

43. When a company discloses non-GAAP financial measures in a Proxy Statement, the Company must also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method), of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.

44. Indeed, the SEC has recently increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders. The former SEC Chairwoman, Mary Jo White, recently stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as the Company has included in the Proxy Statement here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of

> Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures. I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[4]

45. Over the past year, the SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such projections.[5] Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[6] One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide *any* reconciling metrics that are available without unreasonable efforts.

46. In order to make the projections included on page 45-46 of the Proxy Statement materially complete and not misleading, Defendants must provide a reconciliation table of all

---

[4] Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html.

[5] *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0 (last visited 03/06/2017).

[6] *Non-GAAP Financial Measures, Compliance & Disclosure Interpretations*, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017), https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm. (last visited 03/06/2017)

disclosed non-GAAP measures to the most comparable GAAP measures. In fact, the Defendants acknowledge the materially incomplete and misleading nature of said non-GAAP measures in the Proxy Statement: "Non-GAAP financial measures are not intended to be considered in isolation from, or as a substitute for financial measures prepared in accordance with GAAP, including net income. The Company's calculations of these non-GAAP measures may differ from others in its industry and are not necessarily comparable with information presented under similar sounding captions used by other companies." Proxy Statement at 48. Despite disclosing the misleading and materially incomplete nature of non-GAAP financial measures, Defendants fail to reconcile the non-GAAP measures disclosed in the Proxy Statement.

47. The Proxy Statement also fails to provide sufficient information for shareholders to assess the valuation analyses performed by Goldman Sachs and Morgan Stanley in support of their respective fairness opinions.

48. With respect to Goldman's *Selected Companies Analysis,* the Proxy Statement fails to disclose the manner by which stock-based compensation was treated in the provided EBITDA multiples. As a result of these omissions, shareholders are unable to assess whether Goldman's selection was reasonable. The omission of such information renders the summaries of these valuation analyses and the ranges of implied share price on pages 50-51 of the Proxy Statement misleading.

49. Goldman's *Selected Transactions Analysis* fails to disclose the inconsistency between using GAAP EBITDA figures to calculate transaction multiples and then applying said multiples to Mead Johnson's "EBITDA for calendar year 2016 (adjusted to take into account certain non-recurring itesm/charges as identified by the Company)." Proxy Statement at 54. The

omission of such information renders the summaries of these valuation analyses on pages 52-54 of the Proxy Statement incomplete and misleading.

50. Goldman's *Selected Historical Premia Analysis* disclosed that transactions with premia greater than 200% were excluded, but fails to disclose how many transactions met this criteria. The statement is materially misleading because stockholders are unable to discern whether premia greater than 200% were outliers. As a result, stockholders are unable to determine whether the range used by Goldman was reasonable. Thus, information regarding the excluded transactions must be disclosed in order to correct the misleading summary on page 54 of the Proxy Statement.

51. In Goldman's *Illustrative Present Value of Future Share Price Analysis*, it is disclosed that a discount rate of 8.8% was used based on Goldman's estimate of Mead Johnson's cost of equity. However, the Proxy Statement fails to disclose Goldman's reason for not using a range of discount rates like in its *Illustrative Discounted Cash Flow Analysis*. The failure to disclose such differential treatment renders the analysis on page 52 of the Proxy Statement false and misleading.

52. Morgan Stanley's equivalent analysis, *Discounted Equity Value Analysis*, used a cost of equity estimate of 7.8%. Just like Goldman, the Proxy Statement fails to disclose Morgan Stanley's reason for not use a range of discount rates like its *Discounted Cash Flow Analysis*. The failure to disclose such differential treatment renders the analysis on page 60 of the Proxy Statement false and misleading.

53. In regards to Goldman's *Illustrative Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose key inputs and assumptions, specifically: (i) the manner by which Goldman derived the discount rate range of 7.75% to 8.25%, (ii) the assumptions used in

calculating the estimate of the Company's weighted average cost of capital, (iii) whether Goldman treated stock-based compensation as a cash expense, and if so, the (iv) amount of that stock-based compensation. Because the Proxy Statement fails to disclose the aforementioned information, the summary of the analysis found on page 52 is materially incomplete and misleading.

54. Morgan Stanley's *Discounted Cash Flow Analysis* also fails to disclose key inputs and assumptions, specifically: the manner by which Morgan Stanley derived the discount rate range of 6.2% to 7.8%, and the use of forward pricing multiples to calculate terminal value, as the projections only extend to 2021. Further, because Morgan Stanley treats stock-based compensation as a cash expense, the Proxy Statement must disclose the amount. Because the Proxy Statement fails to disclose the aforementioned information, the summary of the analysis found on page 62 is materially incomplete and misleading.

55. In sum, the omission of the above-referenced information renders statements in the Proxy Statement materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Merger, Plaintiff and the other members of the Class will be unable to make a fully-informed decision regarding whether to vote in favor of the Proposed Merger, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

### COUNT I
### Claim for Violations of Section 14(a) of the Exchange Act Against All Defendants

56. Plaintiff repeats and realleges each allegation set forth herein.

57. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

58. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Proxy Statement communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

59. SEC Regulation G has two requirements: (1) a general disclosure requirement; and (2) a reconciliation requirement. The general disclosure requirement prohibits "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure, contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure…not misleading*." 17 C.F.R. § 244.100(b). The reconciliation requirement requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure. 17

C.F.R. § 244.100(a). As set forth above, the Proxy Statement omits information required by SEC Regulation G, 17 C.F.R. § 244.100.

60. The omission of information from a Proxy Statement violates Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

61. Defendants have issued the Proxy Statement with the intention of soliciting shareholder support for the Proposed Merger. Each of the Defendants reviewed and authorized the dissemination of the Proxy Statement, which fails to provide critical information regarding, amongst other things: (i) financial projections for the Company and (ii) the valuation analyses performed by Goldman and Morgan Stanley.

62. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

63. The Individual Defendants knew or were negligent in not knowing that the Proxy Statement is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger; indeed, the Proxy Statement states that Goldman and Morgan Stanley reviewed and discussed its financial analyses with the Board, and further states that the Board considered both the financial analyses provided by Goldman and Morgan Stanley as well as its fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the

Company and knew or should have known of the conflicts faced by Goldman and Morgan Stanley and the timing of management's discussions regarding post-close employment.

64. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy Statement. The preparation of a Proxy Statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy Statement or failing to notice the material omissions in the Proxy Statement upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

65. Mead Johnson is deemed negligent as a result of the Individual Defendants' negligence in preparing, reviewing and filing the Proxy Statement.

66. The misrepresentations and omissions in the Proxy Statement are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Merger.

67. Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**COUNT II**
**Claims for Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

68. Plaintiff repeats and realleges each allegation set forth herein.

69. The Individual Defendants acted as controlling persons of Mead Johnson within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions

as officers and/or directors of the Mead Johnson, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends were false and/or materially incomplete and therefore misleading.

70. Each of the Individual Defendants were provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

71. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same. The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger. Thus, the Individual Defendants were intimately connected with and directly involved in the making of this document.

72. In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Merger. The Proxy Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

73. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

74. Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B. Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Merger or consummating the Proposed Merger, unless and until the Company discloses the material information discussed above, which has been omitted from the Proxy Statement;

C. Rescinding, to the extent already implemented, the Proposed Merger or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

D. In the event Defendants consummate the Proposed Merger, awarding damages to Plaintiff and the Class;

E. Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: March 30, 2017

**FARUQI & FARUQI, LLP**

By: *_/s/ James R. Banko_*
James R. Banko (#4518)
Michael Van Gorder (#6214)

20 Montchanin Road, Suite 145
Wilmington, DE 19807
Tel.: (302) 482-3182
Email: jbanko@faruqilaw.com
Email: mvangorder@faruqilaw.com

*Counsel for Plaintiff*

**OF COUNSEL:**

**FARUQI & FARUQI, LLP**
Nadeem Faruqi
James M. Wilson, Jr.
685 Third Ave., 26th Fl.
New York, NY 10017
Telephone: (212) 983-9330
Email: nfaruqi@faruqilaw.com
Email: jwilson@faruqilaw.com

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
The Empire State Building
350 Fifth Avenue, 59th Floor
New York, NY 10118
Telephone: (212) 971-1341
jmonteverde@monteverdelaw.com

*Counsel for Plaintiff*